The next case this morning is United States v. Bosman. It's number 21-1076. And we will proceed, but I do not. Oh, there he is. Mr. Pincus, you may proceed. Sorry, Your Honor. Just a moment. There's something on my screen. May it please the court. My name is Howard Pincus from the Federal Public Defender and I represent Michael Bosman. The police used unreasonable force when they ordered Mr. Bosman out of a car at gunpoint and had him crawl to the ground. They had no reason to think Mr. Bosman was engaged in any criminal activity. And the report that he had a gun did not support a reasonable belief that the level of force they used was necessary, as Colorado law allows gun possession in a car. The police action was an arrest. As the government agrees there was no probable cause to arrest Mr. Bosman, district court erred in denying his motion to suppress, and this court should reverse. By the way, Mr. Pincus, was it unreasonable for the officers to instruct Mr. Bosman to exit the car? No, we're not claiming that on appeal. They had the right to, just as they did in a traffic stop, to have both the driver who they arrested and the passenger step out of the car, Mr. Bosman. So they could have done that. And what's unreasonable is how they did that here. You ordering him out of the car at gunpoint and having him crawl to the ground. Didn't they weren't they weren't they given information, though, that Mr. Bosman had a gun, and they didn't know where it was. And under those circumstances, didn't that trigger an officer safety situation. It didn't trigger it. Well, they could they could certainly have ordered him out of the car to secure the situation better. What they couldn't do and what the simple gun possession didn't allow was the level of force they used. Well, it was more than just but wasn't it more than just simple gun possession? They they they'd executed the arrest warrant on Mr. Stewart. At first, they didn't think Mr. Stewart had a gun. Then it turns out that Mr. Stewart did have a gun and and revealed that Mr. Bosman had a gun, but they didn't know where it was. They didn't know why. Why wouldn't that be a matter of real concern if all of a sudden there's a second gun and nobody knows where it is? Well, they have to have such a level of concern about dangerousness that the the forcible action they took here was reasonable. This is not a frisk case. This is about the level of action that they took in ordering him out of the car at gunpoint. Now, in in a state where gun possession is not legal to to to carry publicly to publicly carry a gun, there's it could be an inference. And not only is the person acting illegally by having a gun, but that he's more likely to be willing to use it against officers or in further of criminality. There's not such an inference in a state like Colorado where gun possession is legal. And that was the point Judge Harris was making in the United States versus Robinson, the Fourth Circuit case. So the police knew that Mr. From all they knew, Mr. Bosman was acting legally by having a gun on him. They could have had him step out of the car. Didn't the police have additional information here? Number one, they knew that the that the environment was one where there was a another person in the motel that apparently was related or associated somehow with this car that was a felon. They knew that the driver was a felon who was had a warrant for his arrest. They also knew that that both that the vehicle was asked, really, is there are there any guns in the driver? Mr. Stewart, I guess, said no, but he had previously looked back at Mr. Bosman and Mr. Bosman by his silence. Couldn't the police assume that was also a no answer. And at that point, when later, Mr. Stewart said, yeah, Bosman's got a gun. They know that Bosman was light about it. And doesn't that make you more nervous about a gun when somebody denies they have one or at least refuses to say yes in response to a question? And you then say, well, why did they not? Why did they conceal that? Why didn't they answer the question? That makes wouldn't that make an officer more nervous legitimately about what that person might intend to do with a concealed gun? I'm going to take the last of those points first, and that is this admission by silence theory that the government argues here that they never argued below and that they they can't argue here because the facts were not developed on that at all. What we have is at the point when the question was first asked of Mr. Stewart, he apparently couldn't hear it. And that's what he looked back to Mr. Bosman. The car alarm at that point was blaring. And it's unreasonable to think. And certainly the record doesn't show that Mr. Bosman would have heard the question, much less the answer, which Mr. Stewart gave to the officer facing out of the car, which isn't captured on Officer Gilman's body cam as the question is. There's simply no basis on which this court can say that the record shows that Mr. Bosman was heard not only the question, but also the answer and that he purposely stayed silent. And again, this was not an argument made in the district court, and it's not an argument, therefore, that the government can use on appeal to justify the district court's decision. The notion that a this court can affirm on any basis and any basis supported by the record. Is is appropriately used when the argument was made in the court below and here and when the record shows the facts on which that theory relies, and neither of those features exist in this case. As for people being in and around the area. As we pointed out, there's no real evidence that there's evidence of one woman standing by the back gate and if you look at the videotapes. As we pointed out in our reply brief, they can the parking lot at various points during it, and you can see that only this one woman is there now. Mr to foyer, the person that your honor was referring to, who was in supposedly in the area, the best information the police had was that he was in the motel and detective marks had watched the area. Before he never made any claim to Mr to foyer was their officer corporal Alice knew Mr to foyer he never said he was there, and the district court found that the best information was that he was not immediately in the area, and there's really no evidence comment by officer Gilman that Mr to foyer was associated with Mr Bosman, and Mr Stewart. So, that can't support the gunpoint action here, either. Let me ask it this way. We know that the officers confronted somewhat perilous circumstance and that there is a firearm, and they don't know where it is you have a messy backseat. You have no idea who you're dealing with, and whether they're sober on drugs, whatever else. What is the most that the officers could have done to get him out of the car, and still have acted reasonably. Well, they certainly could have gotten him out of the car and just by saying would you please get out of the car, or. Well, that's what they were doing up to that point, and he was compliant with them, he was. He kept his hands on his head. The only thing officer given said he was wasn't sure whether he was really trying to open the door lock but he then admitted that really did not was not a concern because he did open the door lock. So, they could have had him just step out of the car, and importantly by that by the point that they would have gotten him out of the car, Mr Stewart was or, and he was the focus of their inquiry, he was already arrested. He was in Corporal Hollis's patrol car handcuffed. The reason they came to the parking lot was already concluded. So, they could certainly have gotten him out of the car, the government hasn't argued that there's some other basis on which the gun would inevitably inevitably have been discovered. For example, in a frisk outside of the car. All that's an issue in this appeal is whether their gunpoint action in ordering him out of the car and and falling or crawling onto the ground was reasonable under the circumstances district court is not as emphatic or certain about that gun pointing as what you're describing. Well, this records comment. And I guess my my overriding point is what was done there in the, in that circumstance, dangerous circumstance was not only to protect the officers but it was also to protect the defendant. Right. In other words, the main goal was, let's get out of this without somebody getting shot. And if that's the goal and it's a pretty important one, don't you get a lot of room on reasonableness. I don't think so here that, first of all, in terms of what the district court was concerned about or regarding pointing the gun and Mr Bosman it's certainly true that the district court in describing the first part of the encounter. That is before the officers learned that from Mr Stewart that Mr. Bosman had a gun was that the officers guns were not pointed at Mr Bosman it was in the low ready position we don't challenge that here on appeal. The issue that district court then did say that once they had the report of a gun. It became more aggressive, and certainly that officer Gilman was pointing his gun more in the direction of Mr. Bosman, although not a full point barrel pointing at Mr Bosman, but it's certainly the case that they both spoke officer Gilman and officer Sandoval said, if you don't comply with us. If you're if your hands move anywhere where we're either causes us to be frightened, or if your hands go below your shoulder, you're going to be shot and officer Sandoval, as the video clearly shows when the door is open, he has his gun pointed directly at Mr. Bosman, and he says, I have a gun pointed at you. So, there certainly was a gun point the gun certainly were pointed at Mr Bosman, even officer Gilman was in his direction but certainly at the time he was, he came out of the car. Officer Sandoval had his gun pointed directly at him from just a couple of feet away, and he had him crawl out of the car. There were other ways to get him out of the car, the officers could have kept their guns in the low ready position because the, the fact that Mr. Bosman had a gun lawfully as far as the officers knew under Colorado law, didn't give them such heightened didn't heighten the danger so much that a gunpoint seizure and action was required here was reasonable under the circumstances. If you ask a question for me, is the record clear or do we accept for this appeal that the officers forced him to crawl on the ground, as opposed to him simply falling and stumbling onto the ground and that's where the officers encountered even, and so I'm curious, I didn't see in the record any order, you are ordered to crawl on the ground out. So, what does the evidence show about whether he was forced or thrown to the ground or whether he just was on the ground and that was the facts the officers dealt with. He wasn't thrown to the ground he was guided by Officer Sandoval, Mr Bosman's hand remained on his head he was compliant and officer Sandoval use his hands to guide him to the ground as a court district court said gravity being gravity he fell to the ground I'm using crawling as a shorthand, but he had him fall out of the car onto the ground didn't let him come out of the car of his own power which he clearly could. You see cases where an officer is putting a defendant into a car for example, and they often will put their hand on the head of the person to make sure the head is pushed down low enough to get through the door roof, and I'm just wondering if something like that occurred here, or if there was any effort by the officer to throw him on the ground. Well we're not saying he was thrown on the ground but, but he was guided to the ground by Officer Sandoval and I think the video shows that. So, the government doesn't contend there was probable cause to justify what the what the officers did in their gunpoint action was much more than a Terry frisk. It was tantamount to an arrest as this court, recognized in King, and the government doesn't contend there's probable cause to justify the arrest of Mr. Bosman, and for that reason, the district court error in suppress in not suppressing the gun, and this court should reverse. Thank you. Thank you cancel. We'll now hear from this client. May it please the court, Candace Troy client on behalf of the United States. I'd like to start off with what's uncontroversial, because that alone justifies how the seizure unfolded under a Terry the Ohio analysis. There are two men in a small cluttered car. One man with a felony arrest warrant, and one man was identified. This car is parked in a high crime area, and the man with the felony arrest warrant. He turns out to have a gun, despite telling the police that he did not have one. Then, the police learned that the unidentified man. He too has a gun, and they have no information as to where this gun is located. Those facts alone, justify the officers gunpoint action, and the lethal warnings in the final minute of Bosman's extraction. I just want to highlight that it's only this final minute. That's an issue. And when viewing the body camera footage through the lens of officer Gilman, the first three and a half minutes, they're not contested as being unreasonable. And in those first three and a half minutes, there are commands to keep hands up. There's one gun drawn, but it's not pointed. And there's handcuffs tapped on the window. Then, in that final minute, there is the lethal warnings and gunpoint action. So, the question is, is the police conduct in that final minute, that incremental intrusion, so objectively unreasonable that it has turned this otherwise lawful detention into an unlawful arrest? Well, counsel, let me just ask, did any of the officers bother to ask Mr. Boseman directly whether he had a gun? The question was not asked directly to Boseman. There was a question about guns in the car. It was asked by Corporal Hollis twice into the car, directed at Stewart in the first two minutes of the stop. All right. And once they learned that there was a gun, did any of them bother to ask Mr. Boseman where it was? No, that question was not asked because by the time that they learned Boseman has a gun, they've already been giving directions to Boseman for two minutes on how to unlock the door. He's been unresponsive, somewhat unresponsive for Officer Gilman's testimony, which makes it difficult for them to gauge his intent. So, they don't ask him directly, but they continue to give him directions on how to safely exit the vehicle. So, the totality of the circumstances here were actually far more dangerous than what I initially laid out. This was a high crime area where assaults were known to have occurred. There was a separate known felon, Kenneth Tafoya, who was unsecured on the premises. This parking lot was surrounded by vehicles, which the officers could not see inside of. There was also bystanders in the parking lot. May I ask a question here? Was there any evidence connecting Tafoya to these defendants? I mean, to Boseman or to his driver, Stewart? I don't think there was a clear connection established. There was evidence from Detective Marks that Tafoya, the other unsecured felon with an outstanding arrest warrant, was in the nearby vicinity, being inside of the hotel. But nothing that connected him to this car, and so it's no more than, I mean, pretty hard to see how that advances your cause, I suppose. There's no concrete connection. I'm sorry. No, go ahead. There was no concrete connection. It was one of the many unknown factors as the officers walked into what was a dangerous felony arrest situation. Continuing on with the list of factors as to what made this so dangerous, there's the common enterprise theory at play. And by proximity in a small car, these two men were associated with each other, and the officers could reasonably infer that one occupant knew of the other's outstanding arrest warrant and would want to conceal evidence of wrongdoing. This passenger compartment was also cluttered with trash, papers, and at least two backpacks within Boseman's reaching distance. And that's part of what makes any sort of confrontation between the police and occupants of a vehicle so dangerous, is that officers' view of what's going on inside of the vehicle is obstructed by the automobile itself, as well as the material inside of the car. There's also the generally suspicious circumstance of two men sleeping in a car in broad daylight, and there's a hazard associated with waking people up. The officers don't know what sort of possibly worrisome state these individuals are waking up out of. And then there's again the fact that Boseman was somewhat unresponsive to Officer Gilman, as Gilman gave him instructions on how to operate, which by all accord was a simple lock to unlock. So it made it difficult for Gilman to gauge his intentions towards the police. Viewed in its totality, these circumstances warranted a reasonably prudent man to be warranted in the belief that his safety and the safety of others was in danger. Are you still pressing your concealment by silence theory? So I think the proper perspective to view that fact is via Officer Gilman and the reasonably prudent man. It doesn't actually matter whether or not Boseman heard that question, because Gilman heard that question, and it was possible from his perspective. I understand the argument. I guess my question is, given that the point was made earlier that the government didn't rely on that in district court. So I'm asking if you're trying to press that argument at this point. I think it is one fact amongst the totality of the circumstances for this court to consider. And I think it is available to consider because this court has. It was not argued below. It was not argued below. And I could see. I think Appella made a pretty good statement about the additional evidence that would be relevant in the record. Had that been argued below about how loudly the question was asked, whether it would have been heard in the backseat? Was the radio on or off? How soon had the guy woken up, awakened? I mean, I'm not sure we can say here that the record is adequately developed on those facts. And I think that's accurate. There's a lot of facts pertaining to this point which weren't developed. And I think that even if this court were to put that Bosman silence aside, you still have the problem, the issue of dangerousness with regards to Stewart's lie about his own weapons position. And at worst, it's a lie. And at best, it's an untruthful statement about his own weapons possession within the context of a common enterprise between two men in this high crime area. And Mr. Stewart's deceit is fairly. You use the charge from their common enterprise. It makes it sound like there was some evidence of a common enterprise. I guess, oddly, because those are the words you chose. I don't think there's any evidence of a common enterprise. All we know is that two men were sleeping in a car. Unless the enterprise is a nefarious enterprise of trying to sleep in a car. I think from the perspective of officer safety and reasonable suspicion with regards to an individual who's suspected to be armed and dangerous, it is fair for the officers to infer that these two individuals, merely by the fact that they are in an automobile together, are in a common enterprise with each other. It's not sufficient to prove a charge. It's likely insufficient for probable cause. But for officer safety and an armed and dangerous analysis, then I think that the officers were reasonable inferring a common enterprise. Well, Stewart was identity theft, right? That doesn't sound like a very dangerous common enterprise. I believe the officer's understanding of his outstanding arrest warrant was a property crime, and specifically it was related to identity theft. However, the officers know that they're going into a situation where they have to execute a felony arrest warrant. And Officer Gilman testified that the circumstance of executing any arrest warrant, even a traffic warrant, is dangerous. And in the past, he'd been threatened with a firearm under such a circumstance. And so while the underlying crime itself may not be in the category of dangerousness, the fact that it's an arrest warrant, plus that it's a felony arrest warrant, heightens the danger of the situation. Is there any reason the officers couldn't have gotten him out of the car with his hands over his head, without his being on the ground, and without having actually pointed the barrel of a firearm at him? In other words, they could have the firearms at the ready and point at the automobile, as the district judge said, but not put the barrel right on him. Absolutely. That's one of the options that the officers could have used in extracting Mr. Bosman from the vehicle. But I think it's important to note that there's a vast difference between saying that the government's actions here were objectively unreasonable versus formulating the various different ways that they could have acted with the benefit of hindsight that we all have. The officers are not obligated to use the least intrusive means. They have to use reasonable means. And given the fact that they knew Bosman was armed, they had a number of factors which supported dangerousness, including the arrest warrant, Stewart's deceit. And I know that the appellant has conceded in the opening brief twice that the officers could infer some minimal level of indication of dangerousness on the part of Stewart. Their gunpoint action as an incremental intrusion was not unreasonable under these circumstances. When they point the gun or when the officer points the gun directly at him, Mr. Bosman has his hands just exactly where they have asked him to put his hands. So his his hands are not going to have hold of the firearm at that very moment. Right. That's correct. And as long as they stay there, Bosman, Mr. Bosman stays safe and the officers stay safe. But the problem is that the officers don't know if Mr. Bosman harbors any violent intent towards them. And in that final minute that's being contested here, Officer Gilman has to traverse around the back of the vehicle in order to properly cover Officer Sandoval, who's handling the more physical part of the extraction. In those moments, if Bosman were to have made any sort of quick movements, that really was the moment that someone could have been injured if if Mr. Bosman had any ill intent towards the officers. And so I want to return to the concept of the incremental intrusion, and I want to note that those first three and a half minutes involving the contact with Mr. Bosman, those haven't been contested. Those are reasonable. And at that point in those first three and a half minutes, there is a gun drawn. There are handcuffs being tapped on Mr. And the officers are immediately showing a level of restraint when they first make this stop. It's only once the stop escalates and in the words of the district court, has more and more indicia of dangerousness to it that the lethal warnings and the gun pointing is delivered in that final moment. And so there is not a substantial increase in force. It's an incremental intrusion commensurate with the information that's learned about Mr. Bosman, that he does have a gun combined with the most dangerous part of this extraction. To flesh out the armed and dangerous condition here, I think it's important to note that concealed carry really has no place in this analysis. The officers are assessing their safety and officer safety is a compelling government interest. And so the appellant has conceded that the officers were entitled to make a forcible stop that they could ask Mr. Bosman out of the vehicle. And so the question is, what what safety precautions do these officers need to execute in order to main control over the situation? Let me ask you this question. Let's assume that they got Mr. Bosman out of the car without stumbling and falling on the ground, that they simply said, keep your hands up. And somehow with his hands up over his head, he was able physically to unlock the door and activate the lever to open the door. I'm not quite sure how you would do that. But let's assume that those things were accomplished while he was trying to comply with the order not to get shot. And he's just stepped out of the car. Would you think that at that point and then the shouting from from Stewart, he's got a gun. Do you think at that point there would be any doubt if he was standing before them with their hands up that they could have handcuffed him and continue with the Terry stop? No, I believe that would have been reasonable on this circumstance to identify him. And I'm interpreting your hypothetical as the gun dropping out of the vehicle as well. Is that correct? Your Honor? Yeah. Yeah. To me, to me, to me, the whole I mean, I know that we we do allow force in a Terry stop when there's a threat. And I'm just wondering how much weight to give to this stumbling and falling on the ground or being pushed to the ground as opposed to, you know, if we just say, well, that just an accident that could happen. I just don't know what the record shows. I mean, it's all confusing. Your Honor, I see that my time is up. May I answer your question? Yeah, I'm not sure there was a question so much as if the music, but if you've got. I don't know. I don't think it needs an answer. Thank you. Thank you. We'd ask that the court of. Thank you, counsel. I think we have some rebuttal time for Mr Pincus. Yes, and your Honor, the officer Sandoval opened the door and Mr Bosman was having difficulty opening it before because he was instructed to use his left hand and the button was behind him. As you can see in the video when he turned around and used his right hand when they permitted he was able to unlock the door which wasn't being unlocked by the automatic controls. In terms of Terry, I just want to emphasize this is much more than Terry. The issue here is not whether there could be a frisk. The issue here is whether this situation was so dangerous that the gunpoint action here was justified in terms of the high crime area. The testimony was that this was an area that was frequently where crimes occurred and where criminal actors frequented, but at the time they were sleeping, and there was nobody else in the area except for that one woman. And in terms of the common enterprise theory. This court has only used it to uphold a things like a Terry frisk, not a gunpoint action like the one here. So we would ask this court to hold that the to reverse the district court's judgment that there was that the police action was justified, and to read that. So just to be clear, it's the pointing of the gun that you think is the tipping point for you, that is, you would not have challenged this if they had gotten him out of the car with the guns unholstered but not pointing at him and and handcuffed him. Do you think that that would have been okay so is the critical tipping point straw that broke the camel's back the pointing of the gun at him. Yes, the critical point is the forcible action of pointing the gun, saying we're going to shoot if you move your arms a certain way and having him fall out of the car onto the ground. So, yes, the gun pointing is critical. As Judge Madison stressed I mean, I would hate to write an opinion that diminishes, or somehow makes it more liable for the officers to say what they're going to do if the guy moves I mean, I think that's a commendable, maybe over warning but at least support of it. I don't know if that's a question but I'm happy to give a very brief answer, which is that Mr. Bosman had been compliant and there were lots of other ways to have him step out of the car without risking him, and they can't put him at risk, or can't forcibly seize him in the, you know, for this supposed safety reason when there are other means that they could easily have done to get them out of the car safely. There's no further questions we'd ask the court to reverse. Thank you. Thank you both counsel for the arguments this morning. We appreciate the help you've given us on this case. It will now be submitted and cancel our excuse.